UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
AT GREENVILLE

| | |
|---|---|
| LINDA F. LOVE, )<br>)<br>    Plaintiff, )<br>v. )<br>)<br>MICHAEL J. ASTRUE, )<br>COMMISSIONER OF )<br>SOCIAL SECURITY, )<br>)<br>    Defendant. ) | CIVIL NO. 2:07-CV-269<br>(GREER/CARTER) |

**REPORT AND RECOMMENDATION**

This action was instituted pursuant to 42 U.S.C. § 405(g) seeking judicial review of the final decision of the Commissioner of Social Security denying the plaintiff a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(i) and 423. This matter has been referred to the undersigned pursuant to 28 U.S.C. § 636(b) and Rule 72(b) of the Federal Rules of Civil Procedure for a Report and Recommendation regarding the disposition of plaintiff's Motion for Summary Judgment (Doc. 9) and defendant's Motion for Summary Judgment (Doc. 11).

For the reasons stated herein, I RECOMMEND the decision of the Commissioner be AFFIRMED.

<u>Plaintiff's Age, Education, and Past Work Experience</u>

Plaintiff was 58 years old when her insured status for DIB expired (Tr. 47, 205). She graduated from high school and had past relevant work experience as a line operator (Tr. 55, 59, 67-68, 93-94, 205). She was 60 on the date of the administrative hearing (Tr. 205). Plaintiff

1

stopped working on August 31, 1999, after 30 years, when she retired with a pension (Tr. 54, 205, 207).

## Administrative Proceedings

Plaintiff seeks judicial review of the Agency's final decision finding that she was not disabled and, therefore, not entitled to Disability Insurance Benefits (DIB). 42 U.S.C. §§ 416(i), 423(d). The Court has jurisdiction over this action pursuant to 42 U.S.C. § 405(g). Plaintiff applied for DIB in October 2005, claiming she became disabled on December 15, 2002, due to rheumatoid arthritis causing stiffness, limited mobility, flare ups in the hip, inability to button, wash dishes, or climb stairs (Tr. 47-49, 54). Plaintiff's insured status for DIB expired on December 31, 2004 (Tr. 51, 61). In order to be entitled to DIB, Plaintiff has the burden of proving that she became disabled prior to that date. *See Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988) (claimant must show that he became disabled on or before his date last insured).

The Agency denied this application initially, upon reconsideration, and after a hearing before an Administrative Law Judge (ALJ) at which Plaintiff, who was represented by counsel, and a vocational expert testified (Tr. 8-16, 17-30, 34-45). On June 20, 2007, the ALJ issued his decision finding Plaintiff was not disabled because she could perform a significant number of jobs (Tr. 8-16). The ALJ's decision became the Agency's final decision when the Appeals Council denied Plaintiff's request for review (Tr. 3-5). Plaintiff seeks judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).

## Standard of Review - Findings of the ALJ

To establish disability under the Social Security Act, a claimant must establish he/she is unable to engage in any substantial gainful activity due to the existence of "a medically

2

determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). The Commissioner employs a five-step sequential evaluation to determine whether an adult claimant is disabled. 20 C.F.R. § 404.1520. The following five issues are addressed in order: (1) if the claimant is engaging in substantial gainful activity he/she is not disabled; (2) if the claimant does not have a severe impairment he/she is not disabled; (3) if the claimant's impairment meets or equals a listed impairment he/she is disabled; (4) if the claimant is capable of returning to work he/she has done in the past he/she is not disabled; (5) if the claimant can do other work that exists in significant numbers in the regional or the national economy he/she is not disabled. *Id.* If the ALJ makes a dispositive finding at any step, the inquiry ends without proceeding to the next step. 20 C.F.R. § 404.1520; *Skinner v. Secretary of Health & Human Servs.*, 902 F.2d 447, 449-50 (6th Cir. 1990).

Once, however, the Plaintiff makes a prima facie case that he/she cannot return to his/her former occupation, the burden shifts to the Commissioner to show that there is work in the national economy which he/she can perform considering his/her age, education and work experience. *Richardson v. Secretary, Health and Human Servs.*, 735 F.2d 962, 964 (6th Cir. 1984); *Noe v. Weinberger*, 512 F.2d 588, 595 (6th Cir. 1975).

The standard of judicial review by this Court is whether the findings of the Commissioner are supported by substantial evidence. *Richardson v. Perales*, 402 U.S. 389, 28 L. Ed. 2d 842, 92 S. Ct. 1420 (1971); *Landsaw v. Secretary, Health and Human Servs.*, 803 F.2d 211, 213 (6th Cir. 1986). Even if there is evidence on the other side, if there is evidence to support the

3

Commissioner's findings they must be affirmed. *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The Court may not reweigh the evidence and substitute its own judgment for that of the Commissioner merely because substantial evidence exists in the record to support a different conclusion. The substantial evidence standard allows considerable latitude to administrative decision makers. It presupposes there is a zone of choice within which the decision makers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027 (6th Cir. 1994) (citing *Mullen v. Bowen*, 800 F.2d 535, 548 (6th Cir. 1986)); *Crisp v. Secretary, Health and Human Servs.*, 790 F.2d 450 n. 4 (6th Cir. 1986).

The Findings of the ALJ are set out on page 5 and 6 of his opinion and will not be set out herein. They will be referred to when appropriate in the analysis section of this opinion. (*See* Tr. 15, 16).

Issues Raised

Plaintiff asserts the only issue to be determined is whether the Commissioner's decision, that Plaintiff was not under a disability, is supported by substantial evidence (Doc. 10, p. 1). In the brief filed in support of her motion, Plaintiff articulates this argument in more detail as follows:

> 1. Plaintiff first argues the ALJ's decision determining she has the the residual functional capacity ("RFC") to perform medium exertion with no more than occasional manipulation of small objects, is not supported by substantial evidence.
>
> 2. Next, Plaintiff asserts the Commissioner failed to sustain his burden of establishing there was other work in the national economy Plaintiff could perform based on the testimony of the VE (Doc. 10, pp. 7, 8).
>
> 3. Finally, Plaintiff asserts the ALJ's hypothetical question to the VE did not accurately reflect the limitation found by the ALJ that Plaintiff could manipulate objects with her hands on no more than an occasional basis.

4

Relevant Facts

    Medical Evidence

    In October 1999, Plaintiff established with Dr. Boyd as a new patient (Tr. 110). She had no ankle edema, no joint deformity and free range of motion in all joints (Tr. 110). When seen about five months later, in March 2000, Plaintiff reported complaints of neck pain that had improved with therapy but was beginning to worsen (Tr. 110). Dr. Boyd assessed some post traumatic arthritis in the neck (Tr. 110). Three weeks later, x-rays showed osteophytes but no crowding of the foramina, and Plaintiff had no neurological deficits in her arms. Range of motion in the neck seemed to be improved somewhat. Dr. Boyd assessed cervical arthritis improving symptomatically (Tr. 109). In June 2000, Dr. Boyd noted that Plaintiff had "no evidence of significant degenerative disc disease or neurologic deficits" and no hot or inflamed joints (Tr. 109). Plaintiff continued to complain of neck pain in September 2000, but her arms were normal with no neurological deficits in her upper extremities (Tr. 108). During 2001, Plaintiff was seen for a variety of issues generally unrelated to her claimed disability (Tr. 107-08). In March 2001, Dr. Boyd noted Plaintiff's arthritis was responding somewhat to Celebrex; she was not having as much pain (Tr. 107). An August 2001 neurological examination was normal, no motor sensory deficits observed (Tr. 106).

    In January 2002, Plaintiff underwent a bone density scan which was normal (Tr. 141-42). That month she reported that she was doing well on Celebrex (Tr. 106). Her back was straight, stature and posture good with no hot, red or inflamed joints and some stiffness in weight bearing joints. Dr. Boyd indicated he would see her back in six months (Tr. 105, 106). Beginning in 2003, Plaintiff was seen about every three months for a complete blood count and lipid checks;

5

her examinations repeatedly indicated normal extremities and neurological function (Tr. 97-102). In January and February 2003, Plaintiff reported morning stiffness and knee, ankle, and finger pain; her extremities on this occasion were noted to be abnormal; she was diagnosed with probable rheumatoid arthritis (Tr. 103-04). In August 2003, she reported her arthritis was "much better" (Tr. 101). After a few episodes of pain in her finger and foot, in November 2003, Plaintiff reported she was doing well, with medication improving her symptoms (Tr. 171). In March 2004, Plaintiff's finger was not as much of a problem, and she was doing well overall (Tr. 169). In May 2004, Plaintiff reported problems with her right hip for three days, but they improved by June 2004 (Tr. 167). In August 2004, Plaintiff reported "I'm doing good" and was she "doing well from a RA standpoint" (Tr. 164). In September and November 2004, Plaintiff again reported "I'm doing good," with no problems or flares and only slight stiffness in her fingers (Tr. 162-63). On December 22, 2004, 9 days before her insured status expired, Plaintiff reported that she had no pain or stiffness in her joints (Tr. 161).

<u>Medical Evidence after date of last insured - December 31, 2004</u>

During 2005, Plaintiff continued to be seen every three months for lipid checks and for a complete blood count (Tr. 97-99). Her extremities were repeatedly normal (Tr. 97-101). Although Plaintiff reported morning stiffness, she generally reported that she was doing well (Tr. 157-60). In May 2005, Plaintiff reported she was doing well with no major flare ups and no new complaints; her rheumatoid arthritis was doing well and she had full range of motion in her hands and denied any pain or tenderness (Tr. 155-56). In July 2005, Plaintiff was noted to feel well; later that month she reported "I'm doing good" with "no complaints" (Tr. 154). Plaintiff was tolerating her medications, staying active, and walking every day (Tr. 154). In October 2005,

6

Plaintiff reported that she was doing well overall, but had a "slight" increase in pain and stiffness with cold weather (Tr. 153). In November 2005, Plaintiff was doing well, staying active, denied any flare ups, and was tolerating all medications (Tr. 189). Plaintiff continued to do well in 2006 with generally no major flare ups (Tr. 186-88). In July 2006, she reported occasional flares in her feet and hands; in September 2006, Plaintiff indicated that she "does well on the days she takes" medication (Tr. 180).

<u>Plaintiff's allegations and testimony:</u>

Plaintiff reported her pain began in December 2002 (Tr. 76). She claimed she had flare ups two-to-three times per weeks, brought about by the weather, housework, walking, standing, and sitting (Tr. 76). Pain limited her ability to perform housework, yard work, complete holiday cards, write, and hold a book for a long time, ride in a car over 1 hour or drive a car without pain in her fingers (Tr. 77).

Plaintiff testified that prior to her retirement with a pension in 1999, she had trouble with her hands, requiring carpal tunnel release surgery (Tr. 207). She claimed continued pain in her hands following the surgery (Tr. 208). In December 2002, Plaintiff alleged she began having pain in her legs, hips and fingers causing her fingers to swell (Tr. 208). Her physician prescribed Celebrex, and Bextra one month later (Tr. 208-09). She was referred to a rheumatologist and was diagnosed with rheumatoid arthritis (Tr. 209).

Plaintiff alleged finger and wrist swelling, and pain in her hands, hips, knees, and legs with difficulty walking; she also claimed left foot numbness (Tr. 209, 212-13, 215). Her husband often shopped with her at the grocery store and Plaintiff was less able to perform household chores (Tr. 209-10, 216). Plaintiff testified that prior to December 2004, her pain flare ups

7

occurred "maybe every month or so" and did not last "as long as they do now" (Tr. 217). Since December 2004, her pain came and went, "maybe a couple times a month," and "might last a day and go away" but sometimes lasted 2 or 3 days (Tr. 210). Plaintiff alleged difficulty using her hands to complete forms, with dressing, "like taking something over my head," and with brushing her teeth (Tr. 211, 214). Other than pain, swelling and stiffness, Plaintiff denied any other problems with her hands or wrists (Tr. 211). Pain limited her ability to grasp and grip, lift, and hold items (Tr. 212). Plaintiff's medications initially were helpful, but since 2006, her pain had worsened (Tr. 214).

Vocational Expert (VE) Testimony

The ALJ asked the VE a hypothetical question regarding the existence of jobs available to a person with Plaintiff's age, education, and past relevant work, who had the following limitations: medium work with occasional manipulation with the hands (Tr. 219). The VE testified that there were 4,500 jobs regionally and 6,000,000 jobs nationally, that such a person could perform, including: sales clerk, cashier, order clerk, and food service related occupations (Tr. 219).

Analysis

A Plaintiff seeking benefits based on disability bears the burden of proving that she is disabled within the meaning of the Social Security Act (Act). 20 C.F.R. § 426.912(a); *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990) ("The claimant has the ultimate burden to establish entitlement to benefits by proving the existence of a disability as defined in 42 U.S.C. § 423(d)"). In order to establish disability, Plaintiff must prove she had medically determinable physical or mental impairment that rendered her unable to engage in any substantial gainful activity for at

8

least a consecutive twelve month period. 42 U.S.C. § 423(d)(2)(A); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). Plaintiff bears the burden of proving that her residual functional capacity (RFC) precluded the performance of her past relevant work. *Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r. of Social Security*, 127 F.3d 525, 528 (6th Cir. 1997). At step five of the sequential evaluation process, the burden shifts to the Agency to identify a significant number of jobs in the economy that accommodated Plaintiff's RFC and vocational profile. *Her v. Commissioner of Social Security*, 203 F.3d 388, 391-92 (6th Cir. 1999).

In this case the relevant time period at issue is from December 15, 2002, when Plaintiff alleged disability due to rheumatoid arthritis, through December 31, 2004, Plaintiff's date of last insured status. Prior to alleging disability, Plaintiff worked for 30 years and retired with a pension (Tr. 54, 205, 207).

*1. Was there substantial evidence to support the conclusion of the ALJ's that Plaintiff had the residual functional capacity ("RFC") to perform medium exertion with no more than occasional manipulation of small objects?*

Plaintiff argues the ALJ offered no findings as to Plaintiff's limitations, restrictions, and/or work related abilities on a function-by-function basis and cited no evidence of record which supports his RFC determination. She argues the evidence contains no medical opinion whatsoever regarding Plaintiff's limitations, and argues the ALJ's RFC determination was a medical assessment, made without sufficient medical evidence (Plaintiff's Brief, Doc. 10, p. 6).

The Government argues the medical record fails to document significant problems prior to December 31, 2004, the Date of Last Insured, or even thereafter. They note Plaintiff had occasional flare ups and complained of pain, but argue treatment notes generally reflected Plaintiff was doing well, with no major complaints. Noting Plaintiff had no significant lower

9

extremity problems reported during the relevant time period, the Government argues the ALJ found the evidence "is insufficient to establish chronic lower extremity problems that would prevent her from performing prolonged walking or standing" (Tr. 13-14). Accordingly, the ALJ concluded that Plaintiff could "walk for six hours of an eight-hour workday, with normal breaks" (Tr. 14). The ALJ noted that Plaintiff claimed her hands were most affected by arthritis, and his RFC assessment included a limitation to no more than occasional manipulation of small objects with her hands (Tr. 13-14). The ALJ defined medium work, noting that it requires lifting 50 pounds occasionally and 25 pounds frequently (Tr. 14). Therefore, the Government argues the ALJ's RFC assessment included consideration of Plaintiff's limitations on a function-by-function basis.

When one looks at the ALJ's decision, it does contain a review of medical opinions. It is true that no physician appears to have set or assessed any limitations of lifting, standing, sitting or walking, but the record is certainly not devoid of medical opinions during the period of Plaintiff's insured status. The ALJ sets on in his opinion the following:

> Dr. Boyd referred to [sic] claimant to Alton Morris, M.D., who apparently diagnosed rheumatoid arthritis and started the claimant on Methotrexate and Prednisone as well as Darvocet, a combination which appears to have stabilized her condition for the most part and one she continued through her date last insured of December 31, 2004. In April 2003 she reportedly had a good response to the Methotrexate and by May 2003, she reportedly had minimal pain and stiffness. She experienced a flare of arthritic symptoms in the fall of 2003, but appeared to improve when her Methotrexate was increased and she was placed on Prednisone. In March 2004, she told Dr. Morris she was doing well with no flares and minimal morning stiffness. Late that month, she had some pain in her foot, but was overall doing well. In May 2004, she complained of a three day history of pain in her hip and difficulty ambulating. She reportedly took some of her husband's Vioxx and the next day was pain free. Dr. Morris assessed rheumatoid arthritis and trochanteric bursitis. By June 2, 2004, she was "doing well" and her hip was better. Her morning stiffness was described as minimal. In July 2004, she

10

complained that for the past 5-6 days she had experienced a "small flare" of her
arthritis. She stated that she was having morning stiffness for an hour. In late
July 2004, she complained of pain in her right shoulder and was assessed with
tendonitis. She required IV administration of medication, and by August 2004 the
claimant reported she was "doing good" and her arthritis was described as stable.
In September 2004, she was again doing well with no problems other than
stiffness in her fingers. In November 2004, she was doing well with no flares. In
January 2005, her rheumatoid arthritis was described as stable. That same month
Dr. Boyd indicated she had no hot or swollen joints and that she was very mobile.

The remainder of the medical evidence is from treatment the claimant
received after her date last insured.

(Tr. 12, 13).

While she may have had problems with stiffness and loss of grip strength
in her hands, there is no indication of significant loss of strength in the upper
extremities during the period in question for purposes of this decision (December
15, 2002, through December 31, 2004). Accordingly, the undersigned finds that
the claimant was capable of performing medium exertion, albeit with no more
than occasional fine manipulation of objects. Medium exertion involves lifting
and carrying up to 50 pounds on an occasional basis, 25 pounds frequently. It also
requires walking for about six hours of an eight-hour workday, with normal
breaks.

(Tr. 14).

I conclude the ALJ reviewed and considered the medical evidence of record and, based on that review, reasonably concluded Plaintiff had failed to show any further limitations prior to her date of last insured.

Plaintiff's argument that the RFC finding is a medical assessment the ALJ was not qualified to make without expert medical testimony or evidence also fails. In 1996, the Agency clarified the definition of RFC. Social Security Ruling (SSR) 96-8p. The Ruling provides the definition of RFC as follows:

*Definition of RFC.* RFC is what an individual can still do despite his or her limitations. RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work- related

11

physical and mental activities.

SSR 96-8p.

Further, as the Ruling makes clear, RFC is assessed not by physicians, but "by adjudicators at each level of the administrative review process based on all of the relevant evidence in the case record, including information about the individual's symptoms and any "medical source statements" -- i.e., opinions about what the individual can still do despite his or her impairment(s) -- submitted by an individual's treating source or other acceptable medical sources." SSR 96-8p. Thus, while ALJs consider medical source statements in assessing the RFC, the RFC is based on all relevant evidence. In fact, Ruling 96-8p makes clear that "[t]he RFC assessment **must be based on *all* of the relevant evidence in the case record,"** including medical history, reports of daily activities, lay evidence, recorded observations, medical source statements, effects of symptoms such as pain, evidence from attempts to work, and work evaluations if available. 96-8p (emphasis added).

SSR 96-5p clarified that RFC is not a medical issue, but is instead an administrative finding that is dispositive of the case. Specifically, the Ruling provides that, under the Agency's regulations found at 20 C.F.R. § 404.1527(e), "**some issues are not medical issues** regarding the nature and severity of an individual's impairment(s) but are administrative findings that are dispositive of a case; i.e., that would direct the determination or decision of disability." SSR 96-5p (emphasis added). The second specifically listed example is "What an individual's RFC is." SSR 96-5p. Additionally, the Ruling and the Agency's regulations make clear that while adjudicators must consider medical source opinions, including those about issues reserved to the Commissioner, such opinions are never entitled to controlling weight or special significance.

12

SSR 96-5p; 20 C.F.R. § 404.1527(e)(2). Finally, the Ruling provides that "[i]f the case record contains an opinion from a medical source on an issue reserved to the Commissioner, the adjudicator must evaluate all the evidence in the record to determine the extent to which the opinion is supported by the record." SSR 96-5p.

While Plaintiff claims that RFC is a medical assessment which the ALJ is not qualified to make without some expert medical testimony or other medical evidence, the Rulings and Agency's regulations make clear that RFC is an administrative assessment that is reserved to the ALJ, as the Commissioner's delegate, and must be based on all of the evidence of record.

Here, in formulating his RFC assessment, the ALJ looked at the entire record. He noted that, while Plaintiff claimed to be disabled due to rheumatoid arthritis in December 2002, Plaintiff had stopped working years earlier, after she retired and received a pension (Tr. 12). The ALJ observed that the medical evidence of record documented that Plaintiff's condition was essentially stable during the relevant time period. Plaintiff's testimony suggested that her condition had worsened "over the past year" but was more responsive to medication prior to that (Tr. 12). The ALJ detailed Dr. Boyd's notes which repeatedly documented Plaintiff was doing well, had minimal or no symptoms, and her medication was effective (Tr. 12). The record documents that Plaintiff repeatedly reported that she was doing well or had no complaints. In March 2001, Dr. Boyd noted Plaintiff's arthritis was responding to Celebrex; she was not having as much pain (Tr. 107). A January 2002 bone density scan was normal (Tr. 141-42). Plaintiff reported she was doing well on Celebrex (Tr. 106). In 2003, Plaintiff's examinations repeatedly indicated normal extremities and neurological function (Tr. 97-102). While in January and February 2003, Plaintiff reported morning stiffness and knee, ankle, and finger pain, by August 2003, her arthritis was "much better" (Tr. 103-04, 101). After a few episodes of pain

13

in her finger and foot, in November 2003, Plaintiff reported she was doing well, with medication improving her symptoms (Tr. 171). In March 2004, Plaintiff's finger was not as much of a problem, and she was overall doing well (Tr. 169). By August 2004, Plaintiff reported "I'm doing good" and was "doing well from a RA standpoint" (Tr. 164). In September and November 2004, Plaintiff again reported "I'm doing good," with no problems or flares and only slight stiffness in her fingers (Tr. 162-63). Finally, in December 2004, only 9 days before her insured status expired, Plaintiff reported that she had no pain or stiffness in her joints at all (Tr. 161). I conclude this evidence supports the ALJ's RFC assessment.

The argument that the ALJ erred in failing to seek the opinion of a medical expert also fails. As the Commissioner notes, Plaintiff never requested the ALJ to appoint such an expert at the hearing. The Date of Last Insured in this case is December 31, 2004. The hearing in this case was May 21, 2007. There is no reason to believe an expert would be able to offer any opinion as to limitations that existed before December 31, 2004, more than two years earlier. The central question is whether the medical evidence is fully developed so as to allow an informed decision. The Sixth Circuit adopted the Fifth Circuit's standard in this regard in *Landsaw v. Secretary of HHS,* 803 F. 2d 211, 214 (6th Cir. 1986). I conclude the ALJ committed no error in failing to retain further medical experts under the facts of this case.

*2. Was the finding of the ALJ that there was other work in the national economy Plaintiff could perform supported by substantial evidence?*

Plaintiff argues the ALJ's hypothetical question to the VE was flawed because it was based on an unsupported RFC assessment. As stated above, the RFC assessment was properly supported. Plaintiff identifies no limitations during the relevant time period, before Plaintiff's

14

Date of Last Insured, which the ALJ should have included in his RFC assessment.  Given that Plaintiff has failed to prove she could not perform the range of medium work the ALJ found, her challenge to the ALJ's hypothetical question to the VE fails.  *See Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact.").

 *3. Did the ALJ's hypothetical question to the VE accurately reflect the limitation found by the ALJ that Plaintiff could manipulate objects with her hands on no more than an occasional basis.*

 The ALJ's hypothetical question to the VE included a limitation to no more than occasional manipulation (Tr. 219).  His RFC assessment included a limitation of "occasional manipulation of objects" (Tr. 15).  I agree with the Commissioner that there simply is no appreciable difference between the ALJ's RFC assessment and his hypothetical question to the VE.

 Based on an RFC for a range of medium work, the testimony of the VE testimony established that 4,500 jobs regionally and 6,000,000 jobs nationally, that a person like Plaintiff could perform, including: sales clerk, cashier, order clerk, and food service related occupations (Tr. 219).  The VE's testimony provided substantial evidence supporting the ALJ's finding that Plaintiff was not disabled, prior to December 31, 2004, because she could perform a significant number of jobs.  *See Hall v. Bowen*, 837 F.2d 272, 273, 275-76 (6th Cir. 1988) (1,350 jobs is a significant number of jobs in the regional and national economy).

Conclusion

For the reasons stated herein, since there is substantial evidence to support the conclusion of the ALJ, I RECOMMEND the Commissioner's decision be AFFIRMED.

I further RECOMMEND defendant's Motion for Summary Judgment (Doc. 11) be GRANTED, the Plaintiff's Motion for Judgment on the Pleadings (Doc. 9) be DENIED, and this case be DISMISSED.[1]

Dated: November 6, 2008                    s/William B. Mitchell Carter
                                           UNITED STATES MAGISTRATE JUDGE

---

[1] Any objections to this Report and Recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the District Court's order. *Thomas v. Arn*, 474 U.S. 140, 88 L.Ed.2d 435, 106 S.Ct. 466 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive or general. *Mira v. Marshall*, 806 F.2d 636 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Federation of Teachers*, 829 F.2d 1370 (6th Cir. 1987).